IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 14, 2026 Session

IN RE OLIVIA S.[1]

**Appeal from the Juvenile Court for Sevier County**
**No. 2024-JT-17      Keith Edward Cole, II, Judge**

_____

**No. E2025-01048-COA-R3-PT**

_____

This action involves the trial court's denial of a petition for termination of a biological father's parental rights to his minor child. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, P.J., E.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and VALERIE L. SMITH, JJ., joined.

Jonathan Skrmetti, Attorney General & Reporter; J. Matthew Rice, Solicitor General; Mara L. Cunningham, Assistant Attorney General; and Allen T. Martin, Assistant Attorney General, for the appellant, Tennessee Department of Children's Services.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellee, Terrance S.

**OPINION**

## I.      BACKGROUND

Olivia S. ("the Child") was born out-of-wedlock to Kacie L. ("Mother") and Terrance S. ("Father") in October 2022. Father was named on the Child's birth certificate. The Child was born six weeks premature and required medical intervention in the Neonatal Intensive Care Unit. She was later diagnosed with Fetal Alcohol Syndrome. DCS filed a petition for removal based upon Mother's alcohol use while pregnant and Father's knowledge of her use while pregnant.

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

DCS placed the Child in a foster home with her maternal half-sibling, where she has remained throughout the pendency of the proceedings. In a prior action, Father, who was the legal father of the Child's maternal half-sibling, was later determined to not be the biological father of the sibling. Father ceased contact with the sibling after learning that the Child was not his. Mother's parental rights to the sibling were terminated.

As to the Child in this action, Father was granted supervised visitation and was tasked with completing a number of requirements on a permanency plan. Father made significant progress on the requirements, e.g., he was employed, living in stable housing, and was consistent in his visitation with the Child, who required specialized care as a result of her diagnosis. Specifically, the Child had underdeveloped lungs, a chronic lung condition, and asthma that required therapy to teach her how to breath. The Child was dependent on a respirator upon her release from the NICU for approximately four months. As the Child grew, she no longer needed constant monitoring; however, she required feeding therapy to teach her how to swallow without choking and how to chew before swallowing once she progressed to solid foods. The Child required supervision while she ate to prevent her from choking and to ensure that she ate enough.

Father's supervised visitation was focused on educating him on the Child's feeding needs and allowing him to demonstrate his understanding of the care required to ensure proper growth and development. Father exhibited some retained knowledge of the Child's needs but still required direction when feeding the Child. On June 22, 2023, DCS filed a petition for termination of Mother and Father's parental rights. Mother surrendered her parental rights, while Father argued against termination at the hearing. The court denied the petition as applied to Father by order, dated May 30, 2024, finding that DCS failed to establish a statutory ground of termination. The court increased Father's supervised visitation from 2 to 4 hours per week.

On October 2, 2024, DCS filed a new petition for termination of Father's parental rights, alleging failure to manifest an ability and willingness to assume custody of the Child and abandonment by wanton disregard based upon his arrest[2] for violation of probation due to a failed drug screen. The action proceeded to a hearing on February 28, 2025. Testimony from the hearing established that the Child required specialized feeding due to ongoing food sensitivities, requiring great care and caution at mealtimes. While Father was advised of these issues, he sometimes failed to exercise the appropriate caution or bring the proper food during his weekly visitation time. Father, who attended medical appointments, was not as informed as the foster mother regarding the Child's needs and diagnoses. He often relied on DCS or the foster mother to remind him of the Child's needs.

Father explained that it was difficult to feed the Child in the visitation room because DCS did not have a high chair or similar equipment available for him. He balanced the

---

[2] He was incarcerated from August 9, 2024, through September 24, 2024.

Child in his lap while feeding and was told to feed her a certain amount within a specific time frame. His visitation time was focused primarily on the Child's feeding needs, leaving him without the knowledge and understanding that foster mother acquired during her extensive care of the Child in his absence. Father professed that he was chastised for asking questions about the Child's needs during his visitation but then criticized for not asking questions or demonstrating knowledge during the medical appointments that he attended.

Alena Losapio, who has served as the Child's DCS caseworker since October 2023, testified that she did not believe Father was ready for unsupervised contact with the Child because he required redirection during his supervised visitation.[3] She continued,

> I just feel he's not really obtaining the right information, and I worry that if we went to unsupervised, she wouldn't be getting enough food, that he might just give up and not make sure she's full, and that she would keep going back to daycare hungry.

She stated that she advised him multiple times as to the Child's food preferences and requirements but that he has only just started bringing food that the Child will eat even though Father worked at a local restaurant as a cook and had food readily available. She admitted that a transition from supervised visits to unsupervised visits would result in a gradual return to Father, with initial visits of a few hours per month. She agreed that the Child would likely not be harmed during such unsupervised contact with Father.

Ms. Losapio asserted that Father was also not familiar with the Child's medical information and would look to the foster mother to provide updates to the medical provider during appointments. She recalled a specific appointment in which the doctor advised everyone that the Child should drink either milk or water but not juice. She claimed that Father asked her two days later what the Child could drink because he could not remember what the doctor advised. She professed that Father was reticent to admit that the Child had special needs and would require specialized care throughout her lifetime as she developed. She recalled that during one such conversation, he sent her an inappropriate message.[4] She also expressed concern about Father's tendency to carry the Child, who needed to use her muscles to facilitate muscle growth and development.[5]

---

[3] The DCS supervisor confirmed that she was also not comfortable with Father's transition to unsupervised visitation due to his need for instruction and redirection.

[4] Father admitted that he sent the message to Ms. Losapio as a result of his frustration with the prolonged proceedings.

[5] Father admitted that he carried the Child and was affectionate with her because he was limited to spending four hours per week with her.

Tiyawnah Smith testified that she has supervised approximately 18 visitations between the Child and Father, beginning in October 2024. She recalled that Father cancelled one visit but provided proof of a car repair as the reason for the cancellation. She recalled that he also often left visitation a few minutes early to run errands or get to work. She stated,

> Overall, [Father] is very good with [the Child]. He is very funny and she laughs with him. They play together constantly. He's never aggressive or anything during our visits.

She explained that the Child required "a little bit more work" with feeding and that Father often quit feeding her after a few minutes. She explained that the Child wanted to play instead of eat during visitation and that she required redirection to eat a proper amount of food. She said that the Child would skip her nap at daycare if she did not eat enough during visitation. She professed that Father was also confused on which types of food to bring for his visit because the Child preferred homecooked meals with a certain texture. She agreed that Father brought appropriate food after he was advised and reminded of her preferences.

As to the abandonment ground, the testimony presented established that Father was arrested for violation of probation due to a positive drug screen in 2023.[6] Father was spotted by a private investigator with Mother on February 12, 2025, in violation of a court order entered in May 2024. Father testified that Mother came to his residence without his permission to retrieve some items and stayed for approximately one hour.

The foster mother testified concerning the Child's need for extensive medical care and therapy from birth. She professed that the Child has since "graduated" from her therapies but will likely need speech therapy and physical therapy when she's older. She confirmed that medical providers looked to her instead of Father for information. She stated that Father "rarely" asked her questions about the Child. She opined that the Child had also improved in her feeding and would eat "just about anything" if the food was in a proper size to enable self-feeding. She agreed that the Child sometimes needed reminders to continue eating but could sit in a high chair and feed herself with minimal supervision.

Following the hearing, the trial court denied the termination petition, finding that the evidence presented did not support a finding of either abandonment or failure to manifest an ability and willingness to assume custody of the Child. This appeal followed the denial of post-trial motions.[7]

---

[6] The DCS caseworker assigned at that time testified that Father was upset by the results and did not attend visitation after the drug screen. Father has since consistently tested negative on recent drug screens and explained that his positive screen was the result of his ingestion of a THC gummy.

[7] DCS did not appeal the denial of this ground of abandonment.

## II. ISSUE

The sole and dispositive issue on appeal is as follows: Whether the trial court erred in finding that DCS failed to establish the statutory ground of failure to manifest an ability and willingness to assume custody of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence

standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

Here, the trial court found that Father evidenced an ability and willingness to assume custody of the Child, thereby obviating any need to discuss the second element, e.g., whether placing the Child with Father would pose a risk of substantial harm. We agree with the trial court's assessment. Indeed, much of the testimony presented concerned whether Father was ready to progress to unsupervised visitation based upon the opinion of the caseworkers that the Child might be too hungry to nap upon her return to daycare, not whether termination of his rights was warranted given the circumstances presented.

Citing a number of prior termination cases, DCS argues on appeal that Father's inability to progress to unsupervised visitation necessitated a finding that he had failed to establish a current ability and willingness to assume custody of the Child. The cases cited by DCS are distinguishable from the facts presented here. *See generally In re Edward C.*, 684 S.W.3d 410, 434–37 (Tenn. Ct. App. 2023) (holding that the father lacked the ability and willingness to assume custody of the child when he was limited to therapeutic visitation at the time of the hearing as a result of his abusive behavior toward the caseworker, the child's expression of negative behaviors following visitation, and father's wife who lived in the home and had been found to have abused her own children); *In re Dorothy A.*, No. M2023-01511-COA-R3-PT, 2024 WL 5196583, at *7–14 (Tenn. Ct. App. Dec. 23, 2024) (holding that the parents lacked the present ability to assume custody of the children based upon their failure to demonstrate appropriate parenting skills as a result of their severe mental impairments that rendered them incapable of ever caring for the children without supervision); *In re Michayla T.*, No. M2018-00367-COA-R3-PT, 2018 WL 6444134, at *3–9 (Tenn. Ct. App. Dec. 7, 2018) (holding that the mother lacked the current ability and willingness to assume custody of the child when she was in an inpatient drug treatment program, had never remitted child support, had not established a suitable home, and was found in possession of methamphetamine five months before the termination hearing); and *In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *8–10 (Tenn. Ct. App. Sept. 3, 2020) (holding that the mother lacked the ability and willingness to assume custody of the child when "her intellectual disabilities render[ed] it difficult for her to provide the appropriate care" for the child).

Here, Father attended visitation and medical appointments regularly, engaged with the Child throughout visitation, and exhibited improvement in his care and feeding of the Child. Father had also maintained employment, suitable housing, and reliable transportation. While we agree that Father had not progressed to unsupervised visitation at the time of the hearing, the evidence presented was woefully deficient to establish the termination of his parental rights. With these considerations in mind, we affirm the court's denial of the petition for termination of Father's parental rights to the Child.

## V. CONCLUSION

The judgment of the trial court is affirmed.  The case is remanded to the trial court for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, the Tennessee Department of Children's Services.


s/John W. McClarty

JOHN W. McCLARTY, JUDGE